## COMMONWEALTH *vs.* JUAN MEJIA.

Hampden. November 10, 2011. - January 24, 2012.

Present: IRELAND, C.J., SPINA, BOTSFORD, GANTS, & DUFFLY, JJ.

*Evidence,* Admissions and confessions, Consciousness of guilt. *Constitutional Law,* Admissions and confessions, Jury. *Practice, Criminal,* Admissions and confessions, Required finding, Voir dire, Deliberation of jury, Mistrial, Capital case. *Jury and Jurors. Homicide.*

At a murder trial, the judge did not err in allowing the Commonwealth to present evidence of the defendant's behavior when police sought to question him at a hospital prior to his arrest, where the circumstances of the encounter demonstrated that the defendant had not been subject to a custodial interrogation. [389-391]

The evidence at the trial of indictments charging murder in the first degree was sufficient to demonstrate that the defendant had murdered the victims, and that he had done so with deliberate premeditation and extreme atrocity or cruelty. [391-393]

At the trial of indictments charging murder in the first degree, in which an unsigned note that the defendant had handwritten in Spanish was inadvertently sent to the jury room after being excluded from evidence, the judge did not abuse his discretion in denying the defendant's motion for a mistrial, where the jury were unable to determine the contents of the note; where the judge, after individual voir dire of the jurors, removed the one juror who stated that she could not be impartial; where the judge gave a strong instruction that the jury focus only on the evidence. [393-396]

INDICTMENTS found and returned in the Superior Court Department on January 3, 2008.

The cases were tried before *C. Brian McDonald,* J.

*Janet H. Pumphrey* for the defendant.

*Jane Davidson Montori,* Assistant District Attorney, for the Commonwealth.

IRELAND, C.J. The defendant was convicted on three indictments charging murder in the first degree of the victims, a mother and her two daughters, on theories of deliberate premeditation and extreme atrocity or cruelty. On appeal, the defendant argues that the judge erred in allowing the Commonwealth to present

evidence of the defendant's demeanor, in denying his motion for a required finding of not guilty, and in denying his motion for a mistrial because an unsigned note he had handwritten in Spanish was erroneously sent to the jury room. He also asks that we exercise our power under G. L. c. 278, § 33E, to reduce the verdicts to murder in the second degree. Because there is no merit to the defendant's claims of error and we discern no reason to exercise our power under G. L. c. 278, § 33E, we affirm his convictions.

*Facts.* We present the essential facts that the jury were warranted in finding, reserving certain details for our discussion of the issues raised.

On Wednesday, December 12, 2007, the decomposing bodies of the mother and her two daughters were found concealed in their fifth-floor apartment at 94 Pearl Street in Springfield, where they had lived with the defendant, who was the husband of the mother and the girls' stepfather. The usually neat apartment was in disarray, particularly one bedroom. There was no sign of forced entry or robbery. The victims were bound with rope. The medical examiner testified that their bodies all showed "decomposition of a significant degree" and estimated that the mother had been deceased for at least four to five days.

The mother had multiple stab wounds, her throat was slashed to the spine, and she had blunt force trauma to the head. She died of blood loss and blunt force injury. Her body was found under various items in a bedroom closet. Her head was wrapped in a plastic bag and there was a gag in her mouth.

The older daughter, who was nine years old, had died of manual strangulation. Her body was under blankets and other items on a bed in the room where her mother was found. The mattress of the bed had been turned over, concealing a large blood saturation stain that matched the location of a blood stain on a comforter discovered in a trash bag located in the closet where the mother's body was found. The mother's blood was spattered on the wall, on the floor near the head of the bed, on an iron located near broken panes from a window, and on the window frame itself. Two knives were found in the bedroom, one under the "covers" on the bed and the other by the closet door.

The younger daughter, who was six years old, died of asphyxia

caused by a pair of tights being forced into her throat. Her body was under some blankets in a closet in another bedroom.

In addition to evidence of concealing the bodies and blood-stained mattress and comforter, there was evidence that someone had attempted to clean up the crime scene. Three bleach bottles and a mop were in the bathroom. The mop and the handle to the shower tested positive for blood.

There were no usable fingerprints found. However, various testing for deoxyribonucleic acid (DNA) revealed that the defendant matched the minor DNA profile on the ropes from the older daughter's wrists, as well as the "handler" DNA from the bruises on her neck.

The events leading up to the discovery of the bodies were as follows. The defendant worked at a location near the apartment building. On Wednesday, December 5, 2007, he left work at 6:31 A.M., some thirty minutes after he began, because he was ill. He never returned.

Migdalia Rivera, the mother's sister, testified that she and her sister spoke on the telephone at least once every day. The last time she spoke to her sister was on Friday, December 7, at 4 P.M. Her telephone calls after that time went unanswered. Rivera became so concerned about her sister that she went to the apartment on Monday and, receiving no response to her knocks, asked a neighbor whether she had seen the victims. Neither the mother nor her daughters was seen after Friday by neighbors in the apartment building.

Another witness attended the same church as the victims and would pick them up in the church's van to take them to services. She testified that she spoke to the mother on Wednesday, December 5, but her attempts to reach the mother by telephone on Thursday, Saturday, and Sunday about attending Sunday services went unanswered. The victims did not attend the 2 P.M. service.

On Saturday and Sunday, December 8 and 9, two residents of the apartment building saw the defendant inside and outside of the building, acting strangely. He was outside on Saturday for a time, dressed inappropriately for the cold weather, with a white shirt wrapped around his right hand. At some point another tenant let him inside. He approached the front door to his apart-

ment, appeared to search for his keys, but never entered the apartment. Instead, he was seen standing near his front door for several hours.

On Sunday, he was outside on the back porches to the fourth and fifth floors of the apartment building, still inappropriately dressed and shaking from the cold, talking to himself, and attempting to enter a vacant apartment in the building. He was seen eating food from trash bags, including a banana peel. He knocked on the back door to his apartment and tried to open it. He sat outside the window of one tenant's apartment, repeatedly tapped on the window, and called the older daughter's name. He also tried to open another tenant's back door and peered in one of the windows to her apartment. She telephoned police, who arrived at approximately 11:40 P.M.

Because the defendant was dressed inappropriately and shivering from the cold, he was put in a police cruiser, where he remained until he was taken to a hospital. One officer looked in the cruiser and saw the defendant pantomiming that he was eating food from an imaginary plate. The officer telephoned for an ambulance.

The defendant told another officer that he had attended church with his wife that day until noon after which they had had a fight.[1] He stated that she had "kicked him out" of their apartment and that he had had no time to take clothing.

Officers went to the defendant's apartment and knocked on the front door several times. There was no answer. No one tried to open the door. However, an officer noticed a "shirt and fleece-type jacket" near the door that he brought down to the defendant, who immediately put them on. When the ambulance arrived, the officers convinced the defendant to go to a hospital to be treated for exposure. The defendant got into the ambulance and while the attendants were questioning him, he stated that he had not been taking his antipsychotic medication for approximately twenty days.

On Wednesday, December 12, because Rivera was still concerned about her sister, she and her boy friend returned to the apartment. There was an odor in the hall. They tried the door; it

---

[1] We note that the defendant speaks very little English and, while police were talking to him, Spanish-speaking police officers (and others) translated for him.

was unlocked. The boy friend entered the apartment where he discovered the older daughter's body. A neighbor telephoned 911.

After the bodies were discovered, the defendant was arrested later that evening at a hospital.[2] He had small cuts and abrasions on the two middle fingers of his left hand and on the palm, index finger, and thumb of his right hand. A red-brown stain on the toenail of his right foot tested positive for blood. Stains on the sweatshirt, jeans, and T-shirt the defendant was wearing when he was arrested tested positive for his blood. One of the stains on the T-shirt was a mixture of the defendant's blood and that of someone else.[3]

The defendant did not testify or call any witnesses. Through cross-examination of the Commonwealth's witnesses and closing argument, defense counsel challenged the adequacy of the investigation, particularly evidence that linked the defendant to the murders.

*Discussion.* 1. *Evidence of the defendant's behavior at the hospital.* After the bodies of the victims were discovered, approximately eight police officers went to the hospital where the defendant was a patient. Five of them waited downstairs. One detective, Edward F. Sierra, who spoke Spanish and was in plain clothes, went to the defendant's room. The defendant was dressed in street clothes and seated on his hospital bed. Without identifying himself as a police detective, Sierra asked the defendant whether he would speak to him in "a more private setting." The defendant was not restrained. He followed Sierra to a conference room that contained a table and chairs and was located "down the hall." Once they entered, the detective identified himself and introduced a police detective and a police sergeant who were already in the room. He then told the defendant that they wanted "to talk to him about something that happened on Pearl Street." Sierra did not give a particular address or details about what they wanted to discuss.

---

[2]As discussed *infra*, the defendant was arrested at a hospital on Wednesday, December 12. It appears from the record that the defendant had remained hospitalized from the time he was transported by ambulance until his arrest.

[3]Testing of the mixed blood excluded the two daughters but was inconclusive as to the mother.

Although the defendant did not respond, he started to breathe harder. Sierra asked the defendant whether he knew why they were there. The defendant, who was seated at the table, began a very violent rocking, shaking and thrashing back and forth, banging his head on the table as he did so. Sierra grabbed the defendant and held him until he seemed to relax. Once released, the defendant put his fist into his mouth "like he was trying to shove it down his throat." Sierra pulled the defendant's arm down and told him to calm himself. The defendant appeared to do so. However, the defendant took his other arm and grabbed his throat, so Sierra pulled his arm down. The defendant began rocking in the chair again so violently that it appeared as if the chair would tip over. The officers became concerned for the defendant's safety, so they brought him "down to the ground," restrained him on the floor, and went to get a nurse. The nurse gave the defendant a pill. He seemed to calm down. Shortly thereafter, he was arrested and brought to the police station.

Before trial, the Commonwealth moved in limine to admit in evidence Sierra's observations of the defendant's behavior at the hospital, in order to show the defendant's knowledge of the crimes and his consciousness of guilt. The defendant opposed, arguing that he had invoked his right to remain silent when he was put in the ambulance. The judge allowed the motion, stating that the police did not know of the murders when the defendant was sent to the hospital on Monday, and therefore he was not under arrest at that time. At trial, the defendant moved to strike Sierra's testimony, arguing that it was clear that Sierra was sent to the hospital with the sole intention of interrogating the defendant to obtain a confession. In denying the defendant's motion to strike, the judge found that there was no display of force when the police asked to speak to the defendant and no interrogation of the defendant. He found that the defendant's demeanor was a reaction to Sierra's explanation of police presence in the conference room.

The defendant argues that the judge erred in allowing testimony concerning his behavior because he was subject to custodial interrogation but had not been given Miranda warnings. We disagree.

"Miranda warnings are only necessary where one is subject

to 'custodial interrogation.' " *Commonwealth* v. *Morse*, 427 Mass. 117, 122 (1998), quoting *Commonwealth* v. *Jung*, 420 Mass. 675, 688 (1995). " 'To find custodial interrogation, the court must first examine all the circumstances surrounding the exchange between the government agent and the suspect, then determine from the perspective of a reasonable person in the suspect's shoes whether there was (1) a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest and (2) express questioning or its functional equivalent'. . . which includes 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " *Commonwealth* v. *Morse, supra* at 123, quoting *United States* v. *Ventura*, 85 F.3d 708, 711, 712 (1st Cir. 1996). The defendant bears the burden of proving that any interrogation was custodial. *Commonwealth* v. *Kirwan*, 448 Mass. 304, 309 (2007). We look to "(1) the place of interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking to leave, as evidenced by whether the interview terminated with an arrest." *Id.*, quoting *Commonwealth* v. *Groome*, 435 Mass. 201, 211-212 (2001).

We conclude that here the defendant was not subject to custodial interrogation. The defendant was not in custody and he voluntarily accompanied Sierra to the conference room, which was a neutral location. He was not restrained until officers became concerned for his safety.[4] Although Sierra knew that police were seeking an arrest warrant for the defendant and admitted on cross-examination that there was probable cause to arrest, these suspicions were never communicated to the defendant. The questioning was brief and not aggressive, limited to

---

[4]The defendant argues that restraining him on the floor demonstrated that he was in custody. Even if we agreed with the defendant, which we do not, there was no interrogation after the restraint.

Sierra's single statement that police wanted to talk to the defendant about what "happened on Pearl Street," and Sierra's question whether the defendant knew why he was in the conference room. We also agree with the judge that the defendant was not subject to interrogation because Sierra's statement about Pearl Street was merely an introductory remark. Moreover, even assuming that Sierra's subsequent, single question was designed to elicit an incriminating response, it does not change our conclusion because the defendant was not in custody at the time.[5]

The cases cited by the defendant in support of his argument that his behavior indicating consciousness of guilt should not have been admitted are not persuasive, as in those cases, the defendant was in custody, under arrest, or subject to accusations by police. Cf. *Commonwealth* v. *Thompson*, 431 Mass. 108, 116-117, cert. denied, 531 U.S. 864 (2000) (error to admit evidence of defendant's behavior when told of wife's death by police); *Commonwealth* v. *Harris*, 371 Mass. 462, 476-477 (1976) (error to admit evidence of behavior when defendant was under arrest and questioned by police). There was no error.

2. *Motion for required findings of not guilty.* The defendant argues that the judge erred in denying his motion for required findings of not guilty at the close of all evidence without allowing him to argue.[6] The defendant claims that he would have

---

[5]We do not address the defendant's argument that mentioning the defendant's "silence" while questioning Sierra at trial and in the prosecutor's closing argument violated the defendant's rights under *Doyle* v. *Ohio*, 426 U.S. 610, 618-619 (1976). The defendant's silence was mentioned by defense counsel during his cross-examination of Sierra, not by the prosecutor. The portion of the prosecutor's closing cited by the defendant does not include a reference to the defendant's silence (nor is there a reference to his silence elsewhere in the closing argument). Instead, the prosecutor stated that the defendant's behavior was a "phenomenal show," implying that it supported his earlier argument that the defendant had been engaging in "selective lunacy" all weekend.

[6]The defendant moved for required findings at the close of the Commonwealth's case and postponed the argument until the close of all evidence. The judge denied the motion. At the close of all evidence the defendant attempted to renew his motion. The judge refused to let him renew the motion because the Commonwealth's case did not deteriorate, where the defendant introduced no evidence. See *Kater* v. *Commonwealth*, 421 Mass. 17, 20 (1995). The defendant claims that, under Mass. R. Crim. P. 25, as amended, 420 Mass. 1502 (1995), this was error.

We need not address the defendant's argument concerning rule 25. It is im-

argued that there was "scant evidence of guilt" beyond a reasonable doubt because the Commonwealth's entire case was based on the defendant's bizarre behavior, and the handler DNA on the older daughter's neck, which, he asserts, is easily explained by the fact that he lived with her.

In reviewing the denial of a motion for required findings of not guilty, we must determine "whether the evidence offered by the Commonwealth, together with reasonable inferences therefrom, when viewed in its light most favorable to the Commonwealth, was sufficient to persuade a rational jury beyond a reasonable doubt of the existence of every element of the crime charged." *Commonwealth* v. *Linton*, 456 Mass. 534, 544 (2010), quoting *Commonwealth* v. *Lao*, 443 Mass. 770, 779 (2005), *S.C.*, 450 Mass. 215 (2007). The Commonwealth's evidence "may be entirely circumstantial, and . . . the inferences a jury may draw from the evidence 'need only be reasonable and possible and need not be necessary or inescapable.' " *Commonwealth* v. *Linton*, *supra*, quoting *Commonwealth* v. *Lao*, *supra*.

Here, there was sufficient evidence that the defendant, rather than a stranger, killed the victims. The defendant's DNA was on the ropes that were used to bind the older daughter's wrists tightly and on the abrasions on her neck that were produced when she was manually strangled. In addition, the circumstantial evidence supported a reasonable inference that the murders were committed by someone close to the victims. There was no indication of forced entry or burglary in the apartment. Efforts to clean up and conceal the bodies and bloodstained mattress required time. The jury reasonably could have concluded that only the defendant would have known that no one would return home during that time. Further, the defendant lied when he told an officer that he attended church with his wife that day until noon because the service did not take place until 2 P.M. and the jury were entitled to believe the witness who claimed that the victims did not attend services at all.

There also was sufficient evidence that the murders were

material whether there was an error because the defendant's rights to appellate review were preserved when his motion was denied at the close of the Commonwealth's case. See *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 n.1 (1976). We note that trial counsel argued the insufficiency of the evidence at the charge conference.

committed with deliberate premeditation. The defendant took the time to bind all the victims, which the jury reasonably could have concluded occurred before death. He hit the mother in the head with a blunt object, bound her hands and legs with rope, stuffed a gag in her mouth, slashed her throat, and stabbed her twelve times. "Deliberate premeditation may be inferred from the nature and extent of a victim's injuries, the duration of the attack, the number of blows, and the use of various weapons." *Commonwealth* v. *Whitaker*, 460 Mass. 409, 419 (2011). See *Commonwealth* v. *Farley*, 432 Mass. 153, 157-158 (2000), *S.C.*, 443 Mass. 740, cert. denied, 546 U.S. 1035 (2005) (location of multiple stab wounds with knife carried from kitchen sufficient evidence to establish deliberate premeditation). The defendant manually strangled the older daughter which, according to the medical examiner, caused her to lose consciousness only after three to four minutes. The defendant shoved a pair of tights into the younger daughter's mouth and deep into her throat. She did not lose consciousness for three to five minutes. See *Commonwealth* v. *Serino*, 436 Mass. 408, 411 (2002) (evidence of death by manual strangulation sufficient to establish malice and deliberate premeditation).

A jury may consider several factors in determining whether a murder was committed with extreme atrocity or cruelty, including the extent of the victim's injuries and her consciousness and degree of suffering. *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983) (factors to consider for extreme atrocity or cruelty include nature of victim's wounds and whether defendant took pleasure in victim's suffering). Here, the blunt force injury to the mother's head and the slash of her neck alone were sufficient to establish that she had extensive injuries. The older daughter's strangulation and the younger daughter's asphyxiation caused them to endure conscious suffering for at least three minutes. *Commonwealth* v. *Smith*, 460 Mass. 318, 324 (2011), citing *Commonwealth* v. *Linton, supra* at 546-547 (death by prolonged and forceful manual strangulation can support conviction of extreme atrocity or cruelty). There was no error.

3. *Handwritten note.* When police searched the apartment, they found an unsigned note, printed in Spanish, in the defendant's handwriting. The judge allowed the defendant's motion in

limine to exclude the contents of the note, which the Commonwealth had argued constituted the defendant's admission of guilt and his contemplation of suicide. At trial, the Commonwealth was allowed to mark the note for identification as one of the items found in a bedroom. The content of the note was not discussed.

While the jurors were deliberating, the judge notified the parties that the court clerks suspected that a large white envelope containing exhibits marked as identification accidentally had been sent to the jury room. Through a court officer, the jury were instructed to cease deliberations. At about the same time, he received a request from jurors to have the note translated. The judge brought back the jury and learned from the foreperson that about four jurors had seen the note. The judge stated that the error was "serious," consulted with the attorneys, and, before he declared a recess to research the matter, he instructed the jury not to speak to each other about the note or anything else having to do with the case.

The defendant claims that his State and Federal constitutional rights to a fair and impartial jury were violated because his "confession" was revealed to the jury. Although he concedes that "most" of the jurors spoke no Spanish, he nevertheless asserts that "the jury surely knew that the note was the defendant's confession"; and that the untranslated note "was probably more prejudicial than had the note actually been translated." He also claims that the words the judge used to discuss the error with the jury, particularly the words "feared" and "serious," only made the jury focus on it more than they would have.[7]

"When a judge determines that the jury may have been exposed during the course of trial to material that 'goes beyond the record and raises a serious question of possible prejudice' [the judge] should conduct a voir dire examination of jurors to ascertain the extent of their exposure to the extraneous material

[7]The judge's statement to which the defendant objects was: "I've interrupted your deliberations because first we feared and now we know that included among the items sent . . . with you were items that you should not have received. . . . [T]hat note is one of the things that should not be before you. And the clerk tells . . . me that it's not in the envelope of exhibits marked for identification only, so it has been a part of your consideration. . . . It's a serious situation."

and to assess its prejudicial effect." *Commonwealth* v. *Womack*, 457 Mass. 268, 280 (2010), quoting *Commonwealth* v. *Francis*, 432 Mass. 353, 369-370 (2000). Where a "juror indicates that he or she has seen or heard the material, there must be individual questioning of that juror, outside the presence of any other juror, to determine the extent of the juror's exposure to the material and its effects on the juror's ability to render an impartial verdict." *Commonwealth* v. *Jackson*, 376 Mass. 790, 800-801 (1978). A judge is given "wide discretion" to determine whether a defendant is prejudiced by "material disseminated during trial." *Id.* at 799, 800. "A judge has discretion in this area, including whether to declare a mistrial. . . . We review a judge's ruling that the jury remained impartial and could disregard the extraneous information for an abuse of discretion." *Commonwealth* v. *Womack*, *supra* at 280-281, and cases cited.[8]

Here, the judge questioned court personnel to determine the reason for the error and found that it was inadvertent. He also consulted with the attorneys and decided that he would conduct an individual voir dire of each juror at side bar to find out what he or she had seen, whether anyone understood Spanish enough to translate the note, what discussion occurred about the note, whether the jurors saw any other exhibit[9] and whether each juror could remain impartial. Each juror was instructed not to discuss his or her voir dire with any other juror. The questioning revealed that no juror was fluent in Spanish and, of the seven jurors who saw the note and the two jurors who overheard some discussion about the note, none was able to determine its content. The words that some could make out were limited to the name of one of the witnesses, the word "church," and a telephone number. One juror who saw the note expressed confusion because she recalled the judge had sustained an objection

---

[8]The defendant's reliance on cases such as *Commonwealth* v. *Kincaid*, 444 Mass. 381, 392 (2005), and *Commonwealth* v. *Fidler*, 377 Mass. 192, 200-201 (1979), is misplaced, as those cases "involve a postverdict inquiry into a jury's exposure to extraneous information during the jury deliberation process." *Commonwealth* v. *Womack*, 457 Mass. 268, 280 (2010).

[9]The defendant raises no issue about any other erroneously admitted exhibit marked for identification that some of the jurors saw. Having read the record, we conclude that the judge thoroughly questioned jurors concerning those exhibits and did not abuse his discretion in denying the defendant's motion for a mistrial.

to the testimony about the note. She did not speak Spanish, but attempted to translate it and could make out only connecting words such as "for" and "and."[10] All the jurors, except for one, stated that they could remain impartial, which the judge credited. He excused the one juror who stated that she could not be impartial. The judge then appointed an alternate juror to take her place and instructed the jury to begin deliberations anew and "base your verdict exclusively" on the testimony and the exhibits that were marked with yellow stickers. Given that the jury did not know the contents of the note, the removal of the juror who stated that she could not be impartial, and the judge's strong instruction that the jury focus only on the evidence, we conclude that there was no abuse of discretion in denying the defendant's motion for a mistrial.

4. *Review pursuant to G. L. c. 278, § 33E.* The defendant argues that, pursuant to our plenary power, we should reduce the verdicts to murder in the second degree because there was "ample testimony that the [d]efendant was psychotic." Here, defense counsel explicitly said that he was not going to put the issue of criminal responsibility before the jury. Because there has been no posttrial motion charging ineffective assistance of counsel, there is no evidence concerning the reasons trial counsel did not pursue a defense of mental impairment and no development of any evidence concerning the alleged impairment. Trial counsel was experienced and, without more, we will not second-guess his choices. On this record, we are not persuaded that the defendant was suffering from a mental impairment that would justify reducing the verdicts.

*Judgments affirmed.*

---

[10]It was at this point that the jurors asked to have the note translated.