NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11360


COMMONWEALTH  vs.  BENJAMIN SANCHEZ.



Hampden.     December 9, 2016. - April 5, 2017.

Present:  Gants, C.J., Botsford, Lenk, Hines, & Gaziano, JJ.[1]


Homicide.  Burning a Dwelling House.  Abuse
     Prevention.  Evidence, Expert opinion, Admissions and
     confessions, Voluntariness of statement.  Witness,
     Expert.  Constitutional Law, Confrontation of witnesses,
     Waiver of constitutional rights, Admissions and
     confessions, Voluntariness of statement.  Practice,
     Criminal, Capital case, Confrontation of witnesses, Waiver,
     Admissions and confessions, Voluntariness of statement,
     Postconviction relief.




     Indictments found and returned in the Superior Court
Department on August 27, 2009.

     The cases were tried before Peter A. Velis, J., and a
motion for a new trial, filed on May 20, 2015, was considered
by Mark D. Mason, J.


     Elaine Pourinski for the defendant.
     Bethany C. Lynch, Assistant District Attorney, for the
Commonwealth.


---

     [1] Justice Botsford participated in the deliberation on this
case prior to her retirement.

GAZIANO, J.  In the early morning hours of July 12, 2009, a Springfield fire department rescue squad responded to a house fire and found the body of the defendant's estranged wife on the living room floor.  She was transported to a hospital where it was determined that she had been strangled and stabbed.  At trial, the Commonwealth relied on circumstantial evidence to prove that the defendant had entered the house, assaulted the victim, and set the building on fire.  A Superior Court jury convicted the defendant of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty, arson of a dwelling house, and violating a G. L. c. 209A abuse prevention order.

On appeal, the defendant claims that the evidence introduced at trial was insufficient to support his convictions of murder in the first degree and arson.  In addition, he raises the following claims of error:  (1) expert witnesses were allowed to testify about the substance of forensic testing results obtained by other analysts, in violation of his right to confrontation under the Sixth Amendment to the United States Constitution; (2) his custodial statements to police were obtained without a valid Miranda waiver and were involuntary; and (3) the motion judge abused his discretion in denying the defendant's motion for a new trial without an evidentiary hearing.  The defendant also asks that we grant him a new trial

or reduce the verdicts pursuant to our authority under G. L. c. 278, § 33E.  We affirm the convictions and decline to reduce the degree of guilt or to order a new trial.

1.  Facts.  We recite the facts the jury could have found in the light most favorable to the Commonwealth, see Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979), reserving certain facts for our discussion of the issues raised. The defendant and the victim were married for approximately fifteen years.  They had one son together.  The victim also had three children prior to her marriage to the defendant.

In October, 2008, the defendant and the victim separated, at least in part because of the defendant's drug use.  The defendant moved from the house they had lived in to a mobile home park a few miles away.  In March, 2009, the victim obtained an emergency abuse prevention order against the defendant,[2] and in May, 2009, she filed for divorce  At the time of the victim's death, the defendant and the victim shared physical and legal custody of Angel.  The victim initially had been granted sole physical custody, but the custody order was modified approximately one month before her death to provide that Angel

---

[2] Before the defendant and the victim separated, he repeatedly threatened to kill her if he found out that she was involved in a relationship with another man.  At the time of her death, the victim indeed was dating another man.  The defendant mentioned to one of the victim's daughters that he was aware of this relationship.

would spend weekdays with his mother and weekends with his father.

In June, 2009, the defendant asked to meet with the victim to discuss their relationship. She agreed to meet with the defendant on July 9, 2009, despite the abuse prevention order, so long as he brought his brother with him. The defendant assented to this condition, but he arrived alone at the meeting. He asked the victim if she were certain that she wanted to follow through with the divorce. She said that she was. The defendant also expressed a desire to move to Puerto Rico with their son. The victim told the defendant that he would have to make such a request to the court. Upon hearing this, the defendant became visibly upset, slamming the door as he left.

On Saturday, July 11, 2009, the victim left a family gathering around 11 P.M. and was dropped off at her house. At approximately 11:20 P.M., the son called his half-sister, who lived with the victim but was staying at a friend's house that night. The defendant took the telephone from his son and asked the half-sister where she was. When she replied that she was at her friend's house, the defendant asked her "if [she] left [her] mother home alone." She answered, "No." This was a deliberate lie because she did not want the defendant to know that the victim was alone in the house.

At 11:24 P.M., a security camera at the mobile home park

where the defendant lived recorded an image of a sport utility vehicle (SUV), consistent with the defendant's Hyundai Santa Fe, being driven away.  Six minutes later, at approximately 11:30 P.M., one of the victim's neighbors heard a woman scream.  The scream came from the direction of the corner of the street where the victim lived.  The neighbor then heard a man and a woman arguing.  He looked out his window and saw a man and a woman standing at the door of the victim's house, arguing.  He recognized the woman as his neighbor.  The neighbor described the man as light-skinned, about five feet, eleven inches tall, and wearing a light-colored or white T-shirt and dark shorts.  The video surveillance recording showed that the SUV returned to the mobile home park approximately thirty minutes later, at 12:02 A.M. on July 12, 2009.

Also at approximately midnight on July 12, 2009, one of the victim's neighbors smelled smoke and discovered that it was coming from the victim's house.  Fire fighters responded at 12:46 A.M.  A rescue squad found the victim lying unconscious in the living room, in front of her bedroom door.  Emergency personnel transported her to the hospital, where she was pronounced dead.  In addition to burns, she had multiple blunt and sharp force injuries to her head, neck, arms, right knee, chest, back, and hands.  Her death was caused by a combination of sharp force injuries to her left lung, which caused it to

collapse, and inhalation of soot and smoke.  Hospital staff notified police after they discovered bruising and a ligature mark on the victim's neck.

At 3 A.M. on July 12, 2009, Springfield police officers went to the defendant's trailer at the mobile home park.  He accompanied them to the police station, where he gave a statement and provided a buccal swab.  The officers noticed that the defendant had bruises on the back of his right hand and on his right wrist, and a wound on the webbing between the thumb and index finger of his left hand.

The fire investigators determined that the fire had been set intentionally, and began in the victim's bedroom.[3]

The defendant provided statements to police on July 12, 17, and 18, 2009.  He said that, after his son went to bed, he drove his Hyundai Santa Fe SUV to purchase four bags of heroin and that, after returning home and injecting all four bags, he went back to purchase two additional bags.  Initially, the defendant said that he had not been inside the victim's house since April. In a later statement, he said that he and the victim had been together in the victim's house at approximately 3 or 4 P.M. on

---

[3] This conclusion was based, in part, on the following: (1) all but one of the smoke detectors and carbon monoxide detectors had been rendered inoperable at the time of the fire; (2) the fire originated in the victim's bedroom; and (3) investigators ruled out cigarettes, candles, or electrical appliances as causes of the fire.

July 10, 2009, the day before her death.[4]

In the early morning hours of July 12, 2009, the front, back, and side doors of the victim's house were locked. Keys to the house were found behind it, near the front porch of a neighboring house; they were "brand new" and were found on top of leaves and sticks.

At trial, the Commonwealth presented deoxyribonucleic acid (DNA) evidence linking the defendant to the crimes. This included evidence from a red-brown stain on the neck of a white T-shirt discovered in the doorway of the victim's bedroom. That stain contained a mixture of DNA; short tandem repeat[5] (STR) testing showed that the major DNA profile matched the victim's profile, and that the defendant was a potential contributor to the minor profile. There was also another potential contributor to the mixture. Another DNA sample was obtained from underneath

---

[4] One of the victim's daughters testified at trial that the defendant was not at the victim's house on July 10, 2009; the victim's boy friend testified that the victim went to his house at about 9 A.M. that day, and was there in the afternoon.

[5] Short tandem repeat (STR) testing of deoxyribonucleic acid (DNA) focuses on specific places (loci) on the human chromosome where known sequences of DNA base pairs repeat themselves. A DNA analyst measures the number of times these repeat sequences occur at particular loci (called alleles), and uses that measurement to compare known standards against unknown forensic samples. In Y-STR DNA testing, the analyst separates male DNA from female DNA, and examines loci found exclusively on the male Y-chromosome. See Commonwealth v. DiCicco, 470 Mass. 720, 724 n.11 (2015); Commonwealth v. Issa, 466 Mass. 1, 4-5 & n.5 (2013).

one of the fingernails on the victim's right hand.  Y-chromosome STR (Y-STR) testing showed that a the major profile from that sample matched the Y-STR DNA profile of the defendant and his paternal relatives.  A third sample from the victim's neck contained the Y-STR DNA profiles of at least three males; the defendant and his paternal relatives could not be excluded from this mixture.

2.  Discussion.  a.  Sufficiency of the evidence.  The defendant argues that the trial judge erred in denying his motions for required findings of not guilty, because the evidence was insufficient as a matter of law to support his convictions of murder in the first degree and arson.

"In reviewing the denial of a motion for a required finding of not guilty, [this court] must determine whether the evidence, including inferences that are not too remote according to the usual course of events, read in the light most favorable to the Commonwealth, was sufficient to satisfy a rational trier of fact of each element of the crime beyond a reasonable doubt" (citation omitted).  Commonwealth v. Zanetti, 454 Mass. 449, 454 (2009).  "[T]he evidence and the inferences permitted to be drawn therefrom must be 'of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt'" (citation omitted).  Latimore, 378 Mass. at 677.

Having carefully reviewed the trial record, we conclude that the evidence introduced at trial was sufficient to support the convictions of murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty and arson.

We highlight some of the salient facts recited above. The evidence indicated that the defendant had a motive for the killing. Four months before the victim's death, the victim obtained an emergency abuse prevention order against the defendant after a history of domestic violence. A few days before the victim's death, the defendant and the victim had a conversation in which the defendant became visibly "upset" and slammed a door upon hearing from the victim that she would proceed with the divorce and would contest his move to Puerto Rico with their son.

On the night of the stabbing, the defendant asked the victim's daughter if the victim was alone in her house. Although the defendant was misinformed that she was not, the victim indeed was alone in the house at that point, for the first time since she had obtained the abuse prevention order four months earlier. Minutes after the conversation informing the defendant that the victim was at her house, while the son was asleep in the back room of the defendant's mobile home, an SUV similar to the defendant's Hyundai Santa Fe left the mobile

home park.  See Commonwealth v. Phoenix, 409 Mass. 408, 430 (1991).  Six minutes later, a neighbor heard the victim scream, and then saw her standing at her front door arguing with a man.

Early in the morning of July 12, 2009, police found the defendant with injuries on both hands.  His left hand tested positive for the presence of blood.  DNA evidence on a T-shirt found in the doorway of the victim's bedroom, and on her body, contained a mixture of DNA, including a major STR DNA profile that matched the victim's profile and a minor profile from which the defendant could not be excluded.

The defendant made contradictory statements to police about his whereabouts on the day prior to, and the day of, the killing, that were contrary to testimony from the victim's daughter and the victim's boy friend.  See Commonwealth v. Robles, 423 Mass. 62, 71 (1996) ("False statements to police may be considered as consciousness of guilt if there is other evidence tending to prove the falsity of the statements").

Taken together, the evidence also was sufficient to support a finding of extreme atrocity or cruelty.  The victim had blunt force injuries to both sides of her head, her right eye, both arms, and her right knee, and a ligature mark on her neck.  She also was stabbed forty-five times, including stab wounds to her neck and through her left lung.  Her arms and legs were burned, and she inhaled soot and smoke, which contributed to her death,

indicating that she was alive after having been repeatedly stabbed and beaten, and while the fire burned around her.

In light of this, the defendant's argument that the Commonwealth did not meet its burden of proof because the evidence was circumstantial in nature, or because there was no blood or soot in the defendant's vehicle, or on his person or clothing, on the morning after the fire, is unavailing. Viewed in the light most favorable to the Commonwealth, the evidence was sufficient to support the convictions. See Commonwealth v. Lao, 443 Mass. 770, 779-780 (2005), S.C., 450 Mass. 215 (2007) and 460 Mass. 12 (2011) (circumstantial evidence in prosecution of murder in first degree was sufficient to warrant jury's conclusion that defendant killed his estranged wife). Accordingly, we turn to the defendant's other assertions of error.

b. Right to confront DNA analyst. At trial, the defendant repeatedly objected to the testimony of Amy Barber, a DNA unit supervisor at the State police crime laboratory (crime lab), on the ground that her testimony violated his right to confrontation.[6] On appeal, he argues that it was error to permit

---

[6] Three DNA analysts from the State police crime laboratory testified concerning STR and Y-STR DNA testing: Jennifer Montgomery testified to STR DNA profiles from the known samples of the victim and the defendant, and the Y-STR profile from the known sample of the defendant; Amy Barber testified to the STR DNA profiles that were obtained from twelve questioned samples

Barber to testify about the results of DNA testing performed by another analyst, Melanie Knasas, and that the Commonwealth failed to establish that Knasas was unavailable to testify. We conclude that the testimony did not violate the defendant's right to confrontation. See Commonwealth v. Greineder, 464 Mass. 580, 603, cert. denied, 134 S. Ct. 166 (2013); Commonwealth v. Barbosa, 457 Mass. 773, 786 (2010), cert. denied, 563 U.S. 990 (2011).

Under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, a criminal defendant has the right to confront the government's witnesses. See Bullcoming v. New Mexico, 564 U.S. 647, 657 (2011); Melendez-Diaz v. Massachusetts, 557 U.S. 305, 329 (2009). See also Commonwealth v. Nardi, 452 Mass. 379, 388 n.10 (2008) ("the protection provided by art. 12 is coextensive with the guarantees of the Sixth Amendment" [citation omitted]). In addition, our common-law rules of evidence "afford a defendant more protection than the Sixth Amendment." Commonwealth v. Tassone, 468 Mass. 391, 399 (2014). Under the common law, we require that a defendant be provided with a "meaningful opportunity to cross-examine the expert about her opinion and

---

and their comparison to the STR DNA profiles obtained from the known standards; and Kathleen Gould obtained the Y-STR DNA profiles from four questioned samples and compared them to the defendant's Y-STR DNA profile.

the reliability of the facts or data that underlie her opinion."  Id.

Barber's expert testimony did not deprive the defendant of his rights under the confrontation clause.  Knasas worked at the crime lab.  She conducted the initial testing on twelve items (including from the victim's T-shirt, her right-hand fingernails, and her neck) to develop STR DNA profiles for later comparison to known DNA samples.  At the time of trial, however, Knasas no longer was employed at the crime lab, and she was traveling out of State.

Barber was a DNA unit supervisor responsible for the day-to-day operations within the crime lab's DNA unit; she supervised five other chemists and was familiar with all of the crime lab's protocols and procedures.  In addition, Barber was the technical reviewer assigned to review Knasas's analysis in this case, to ensure that the proper protocols had been followed and that Knasas's conclusions were scientifically sound.

Barber did not testify to Knasas's testing results.  During direct examination, the prosecutor prefaced his questioning by instructing Barber, "Now, I want to ask you specifically, Ms. Barber -- I don't want to ask you about any conclusions that have been reached by Ms. Knasas.  I'm going to ask you to testify to your own independent opinions based on the data you just described.  All right?"  Within those parameters, Barber

testified to a chart that she had prepared describing her interpretation of the raw data.

Barber did not, as the defendant suggests, "act as a conduit for" Knasas's test results, opinions, or conclusions. See Greineder, 464 Mass. at 595. Rather, Barber testified that she "reviewed the data that came off of the detection software and was put through the analysis software," formulated her own opinions after interpreting the raw data produced during the process, and drew independent conclusions based upon data produced by the analysis software. Barber also calculated the population frequency of each DNA profile and testified to her results. See Commonwealth v. Chappell, 473 Mass. 191, 199-202 (2015) (no confrontation clause violation where testifying expert independently reviewed raw data and reports produced by original analyst, made interpretations, and ensured that there was agreement between her findings and those of original analyst); Greineder, supra at 595, 601-602 (no confrontation clause violation where substitute analyst reviewed nontestifying analyst's work, including six prepared reports, and then conducted independent evaluation of data); Barbosa, 457 Mass. at 791 (no confrontation clause violation where substitute analyst conducted full technical review of other analyst's DNA reports regarding testing that was performed and results of testing).

Moreover, the admission of Barber's testimony did not

violate the defendant's common-law right to confrontation. See Tassone, 468 Mass. at 399. The defendant had a meaningful opportunity to cross-examine Barber and, in fact, did challenge Barber's testimony, extracting, on cross-examination, that there was a third, unknown potential contributor to the DNA mixture on the white T-shirt. Defense counsel also asked Barber about other unknown results from other swabs, the crime lab's testing procedures and protocols, and why DNA testing was not performed on particular items.

The defendant contends further that the confrontation clause requires the Commonwealth to prove Knasas's unavailability before Barber was permitted to testify. This argument is without merit. We do not require the Commonwealth to demonstrate that an analyst is unavailable as a prerequisite to the admission of substitute expert testimony in order to comport with a defendant's rights under the confrontation clause. See Commonwealth v. Williams, 475 Mass. 705, 718-719 (2016) (substitute medical examiner allowed to testify to her independent understanding of cause of death based on autopsy report and photographs despite availability of medical examiner who performed autopsy).

c. Right to confront electrical-fire investigator. The defendant argues that his Sixth Amendment confrontation clause rights were violated by the testimony of State police Trooper

David Percy.  Percy, an arson investigator, testified that the fire was set deliberately.  In conducting his investigation, Percy was assisted by fire fighter and licensed electrician Benjamin Hall.  Percy observed Hall examine electrical appliances, electrical outlets and wall switches for damage. The defendant argues that the Commonwealth's failure to present testimony from Hall denied the defendant the right to challenge the testimony that the fire was not accidental.  For reasons similar to our discussion of the DNA analysis, we conclude that Percy's testimony did not violate the defendant's rights under the confrontation clause.

Percy, unlike Hall, was not a licensed electrician.  Percy was, however, able to respond directly to the defendant's questions about the decision to rule out an accidental fire based on an electrical source.[7]  Percy had personally inspected the various electrical outlets and electrical appliances in the victim's house, and had formed his own independent opinion concerning the origin of the fire.  Percy did not repeat Hall's opinion.  See Barbosa, 457 Mass. at 783-784.  Having been able to cross-examine Percy concerning the investigation into causes

---

[7] Percy had completed training courses in basic and advanced electrical investigation;, and the failures of appliances and electricity.  He had inspected electrical switches and electrical outlets in the course of investigating approximately 1,000 fires.

of the fire,[8] the defendant was not deprived of his right to confrontation on this issue.  See Barbosa, supra at 784.

d.  Defendant's statements.  The defendant challenges the validity of his waiver of the Miranda rights, see Miranda v. Arizona, 384 U.S. 436 (1966), and the voluntariness of the statements that he gave to Springfield police officers on July 12, 17, and 18, 2009.

The Commonwealth "bears the burden of proving beyond a reasonable doubt, in the totality of the circumstances, that a defendant's [Miranda] waiver was voluntary, knowing, and intelligent."  Commonwealth v. Auclair, 444 Mass. 348, 353 (2005).  "Absent clear error, we accept a . . . judge's findings of fact . . . , and a finding of voluntary waiver is given substantial deference" (citation omitted).  Id.

In reviewing a judge's denial of a motion to suppress, we accept the judge's findings of fact and will not disturb them absent clear error.  See Commonwealth v. Smith, 456 Mass. 476, 478 (2010).  We conduct an independent inquiry as to whether the defendant's statements were made voluntarily and without coercion.  See Commonwealth v. Carnes, 457 Mass. 812, 818-819

---

[8] On appeal, the defendant claimed that his confrontation clause rights also were violated by the Commonwealth's failure to call Springfield police Officer Kenneth Jones as a witness at the hearing on the defendant's motion to suppress.  The defendant is mistaken.  Jones testified on the fourth day of the hearing, and he was subject to cross-examination.

(2010). "A statement is voluntary if, in the totality of the circumstances surrounding the making of the statement, the defendant's will is not overborne, so that the statement is the result of a free and voluntary act." Id. at 819. "In looking at the totality of the circumstances to determine the voluntariness of a statement, the judge may consider, among other things, the defendant's age, education, intelligence, physical and mental stability, and experience with and in the criminal justice system." Commonwealth v. Andersen, 445 Mass. 195, 203 (2005).

Here, we discern no error in the judge's decision to deny the defendant's motion to suppress his statements.

i. Statement on July 12. To begin, we consider whether the defendant was subjected to custodial interrogation triggering Miranda protections. "[T]he safeguards prescribed by Miranda become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with a formal arrest.'" Berkemer v. McCarty, 468 U.S. 420, 440 (1984), quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam). See Commonwealth v. Martinez, 458 Mass. 684, 695 n.12 (2011). It is the defendant's burden to establish that he was subject to custodial interrogation. Commonwealth v. Kirwan, 448 Mass. 304, 309 (2007). "The test is an objective one: would a reasonable person in the circumstances of the defendant's

interrogation have perceived the environment as coercive?"[9]  Id.

     The judge concluded, and we agree, that the defendant failed to establish that the interrogation was custodial.  The defendant voluntarily accompanied the officers from his home to an interview room at the police department.  That the interview occurred at the police station is not, by itself, controlling. See Commonwealth v. Gil, 393 Mass. 204, 212 (1984).  Once in the interview room, the detectives informed the defendant that he was not required to be there.  He was told a number of times that he was not under arrest and that he could leave at any time.  At the end of the two-hour interview, the defendant was not arrested, and was driven home by an officer. See Commonwealth v. Clemente, 452 Mass. 295, 327-328 (2008), cert. denied, 555 U.S. 1181 (2009).

---

[9] The factors relevant to determining whether a suspect is in custody for Miranda purposes include:

> "(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest."

Commonwealth v. Groome, 435 Mass. 201, 211-212 (2001).  "Rarely is any single factor conclusive."  Commonwealth v. Bryant, 390 Mass. 729, 737 (1984).

The defendant also challenges the voluntariness of his statement on July 12.  He maintains that any statements were not the product of rational thought, because he was under the influence of heroin and alcohol, had not taken his medications for mental illness, and suffers from a learning disability.  The judge found these arguments to be without merit.  We conclude that this finding was not clearly erroneous.

Here, "[t]he atmosphere surrounding the officer's questions was neither coercive nor intimidating."  Commonwealth v. Burbine, 74 Mass. App. Ct. 148, 151-152 (2009).  The judge found that the officers' comments, at this point at the beginning of their investigation, were "investigatory rather than accusatory."  Kirwan, 448 Mass. at 311.  The officers spoke to the defendant in English, his second language, in an interview room.  The detectives did not have difficulty understanding the defendant, and he did not appear to have difficulty understanding them.  The detectives simplified the manner of their questioning in order to accommodate the defendant's learning disability.  They did not challenge the defendant's answers to questions.  The defendant was cooperative and answered questions readily.  The detectives neither threatened the defendant nor made any promises in order to induce him to speak.  The defendant was alert and did not appear to be under the influence of drugs or alcohol.  He remained calm

until the detectives notified him of the victim's death.  After the interview, one of the detectives read a typed statement to the defendant because he had indicated that he was not able to read or write, and the defendant then signed it.[10]

We note that, during the July 12 interview, a detective falsely informed the defendant that the victim had been pregnant when she died.  The judge did not accept the detective's explanation that he passed along this upsetting information to the defendant because he "must have been told by somebody that she may have been [pregnant]."  The judge found that "[t]his news did upset the defendant, but even if it were intended to elicit incriminating statements regarding [the victim's] death, such a tactic was unsuccessful. . . .  [I]t did not have any impact on the defendant's statement."  The judge's findings regarding the impact of the detective's false statement are not clearly erroneous.

ii.  <u>Statement on July 17</u>.  The defendant contends also that, because he was under the influence of alcohol and heroin, and had not taken his medications for his mental illness at the

---

[10] We note that the judge incorrectly stated in his findings of fact that the defendant had requested a correction to this statement before signing it, and referenced that as further indication that, when he made the statement, the defendant had been alert, unimpaired by drugs or alcohol, and able to understand the detectives' spoken English.  This error is of no moment, however, as our review of the course of conduct of the interview persuades us that the defendant was alert, unimpaired by alcohol or drugs, and able to understand the detectives.

time of his arrest, his Miranda waiver and subsequent statements were not voluntary, and his recorded statement on July 17 should have been suppressed. In light of the totality of the circumstances, we conclude that the judge properly determined that the defendant knowingly and voluntarily waived his Miranda rights, and voluntarily provided the statement to police.

After he was arrested on July 17, the defendant was transported to the police station and brought to an interview room. The detectives asked the defendant if he wanted a Spanish-speaking officer to translate. The defendant accepted this offer, and a Spanish-speaking detective joined them. This detective spoke to the defendant in Spanish. The defendant agreed to speak English during the interview, and to have portions of the interview interpreted as needed. During the interview, the Spanish-speaking detective clarified a few terms, but the vast majority of the interview was conducted in English, without apparent difficulties.

The detectives began the recorded interview by advising the defendant of his Miranda rights, his telephone rights, and his right to a prompt arraignment. The detective read each right to the defendant, who indicated his understanding of each right orally and by initialing each line on the form. In response to line eight on the form, "[h]aving these rights in mind do you wish to talk to me now?" the defendant wrote his initials and

said, "I don't have a problem." When the detective asked the defendant if he wanted to use a telephone, the defendant replied, "In a little while," and the detective told the defendant to let him know when the defendant wanted to use it.

While, as the judge noted, it would have been better practice to inquire into the defendant's need for medication, once the defendant alluded to his medications for mental illness, the judge found that "the defendant was coherent, [and] able to understand the questions put to him . . . , and that the defendant's responses to the questions were generally appropriate and evidenced his comprehension of the questions."[11] The judge found that defendant's demeanor indicated that he was not impaired by alcohol, heroin, or the lack of medication.

About ten minutes into the interrogation, the defendant handed a detective a criminal defense attorney's business card and said, "Call him." The detective considered the defendant's act and remark as an invocation of his right to counsel and, accordingly, ended the interview. The detective informed the defendant that he would be booked and processed, and that he would be able to make a telephone call.

After the defendant invoked his right to counsel, however,

---

[11] The defendant denied any involvement in the victim's death. See Commonwealth v. Fournier, 372 Mass. 346, 348-349 (1977) (fact that statement is exculpatory may be taken into account in determining whether it is voluntary).

the detective told the defendant, "I am disappointed because I thought you'd step up and take [your son] out of this." This comment was highly inappropriate, as the detective did not scrupulously honor the defendant's right to speak through counsel. Once Miranda warnings have been given, if a defendant states that he or she wants an attorney, the interrogation must cease until an attorney is present. See Commonwealth v. Brant, 380 Mass. 876, 882, cert. denied, 449 U.S. 1004 (1980). Interrogation refers "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect" (footnote omitted). Rhode Island v. Innis, 446 U.S. 291, 300-301 (1980). See Commonwealth v. Mejia, 461 Mass. 384, 390 (2012). The detective's comment, which was designed to induce the defendant to make incriminating statements in an effort to protect his son, constituted the functional equivalent of interrogation after the defendant had invoked his right to counsel and to silence.

The judge found that the defendant "did not . . . take the bait, and he remained silent." After carefully weighing the circumstances, the judge determined that the effect of the officer's comment had dissipated by the time the defendant recanted his invocation of his Miranda rights on the following

day, and we do not disturb this finding. See Commonwealth v. Bradshaw, 385 Mass. 244, 258-259 (1982) (taint of police misconduct had dissipated, and defendant's subsequent statement was not fruit of poisonous tree where defendant was provided Miranda warnings at least twice before he made statement, interrogation began approximately two hours after police misconduct, and there was no insistent questioning or brutality on part of police).

iii.  Statement on July 18.  The defendant argues that the police questioning on July 18 was improper because he had invoked his right to counsel on the previous day, and also that his statements were involuntary because he was experiencing heroin withdrawal, was without his medication for his mental illness, and was disadvantaged by a learning disability.  Based on these factors, the defendant argues that his statements were "not a product of rational thought."  The judge rejected these arguments.  We discern no error in the judge's assessment.

Once a defendant invokes his or her right to counsel, the defendant may not be questioned until counsel has been made available, unless the defendant himself or herself initiates further communication with police.  See Commonwealth v. Judge, 420 Mass. 433, 450 (1995).  Here, the judge concluded that the defendant "subsequently decided independently" to speak with police without an attorney, and initiated his further contact

with police following his invocation of his right to counsel on July 17.  See id. at 450-451.  See also Edwards v. Arizona, 451 U.S. 477, 484-485 (1981).

On July 18, Springfield police Officer Kenneth Jones was walking by the defendant's cell at 9 A.M., during a routine cell check, when the defendant indicated to Jones that he wanted to speak to the detectives.  Jones did not initiate the conversation.  The detectives asked the defendant if he wished to speak without a lawyer present, and the defendant indicated that he did.

In response to the defendant's request, the detectives brought the defendant to an interview room in the detective bureau.  The interview was recorded.  The detectives spoke to the defendant in English after he indicated that he understood English.  They had no difficulty communicating with the defendant over the course of an interview lasting two hours and twenty minutes.  The officers reviewed what had occurred on the previous day and earlier that morning.  They again read each line of the Miranda rights form to the defendant, he initialed each line indicating his understanding, and he indicated that he would speak without an attorney present.

In light of all the circumstances, we conclude that there was no violation of the defendant's Miranda rights at the July 18 interview, because he himself initiated contact with the

police, a significant period of time had elapsed between his invocation of the right to counsel on July 17 and his election to speak without a lawyer present on July 18, and, before he spoke, he was provided, and again waived, his Miranda rights. See Commonwealth v. Rankins, 429 Mass. 470, 472-473 (1999).

Police may not badger a defendant into waiving his or her previously asserted Miranda rights. See Michigan v. Harvey, 494 U.S. 344, 350 (1990). The detective's statement on the previous day concerning "tak[ing] [the defendant's son] out of this" did not, however, constitute postinvocation badgering, where approximately eighteen hours separated the defendant's invocation of his right to counsel and the defendant's initiation of further dialogue with the police. See Rankins, 429 Mass. at 473.

The judge properly found the defendant's July 18 statement to be voluntary. The defendant did not request an interpreter, as he had the previous day, and the detectives were able to communicate with the defendant without difficulty. The defendant was alert and did not appear to be experiencing withdrawal symptoms. He did not clearly tell the detectives that he took medication for a mental illness. The defendant answered the officers' questions and often provided more information than what was requested. He recounted his activities the day of and the day preceding the murder. He

never sought an end to the interview and never requested a lawyer, a request he clearly knew how to make given that he had asked for a lawyer the previous day.  Although the defendant told police that he was "high" twenty-four hours a day, and that he had a daily heroin habit, the evidence does not show that the defendant was impaired due to withdrawal from heroin.[12]

A detective typed a written statement for the defendant, printed it, and another detective read it out loud.  The defendant did not agree with the statement.  He insisted that the detectives delete words referring to the victim's death from the paragraph describing the purpose of the detectives' interrogation, insisting that he had had nothing to do with her death.  Once that change was made, and the defendant was read the revised version, he signed the statement.

We accordingly conclude that the defendant reinitiated contact with the police, knowingly and voluntarily waived his Miranda rights for a second time, and voluntarily gave a second statement.

    e.  Evidentiary hearing on motion for postconviction

---

[12] The judge found that "for the first few minutes of the . . . interview, the defendant's legs were shaking, his hands were fidgeting, and . . . he repeatedly requested cigarettes. Once he smoked the first cigarette and was told that he would have to wait for the second . . . cigarette, the defendant calmed down considerably for approximately [thirty] minutes, during which time he focused on answering the detectives' questions.  The defendant did not seem confused or disoriented."

relief. The defendant filed a motion for a new trial based on a claim of ineffective assistance of counsel, which was denied without an evidentiary hearing.[13] The defendant contends that, because his motion for a new trial raised a constitutional claim of ineffective assistance, and was supported by affidavits, it was error to deny the motion without an evidentiary hearing. In his motion for a new trial, the defendant claimed that he heard voices during the trial, and that he was deprived of the effective assistance of counsel due to counsel's failure to bring his mental state to the court's attention. The defendant submitted his own affidavit and the affidavits of his two sisters as evidence. An affidavit by trial counsel contradicted the defendant's claims.[14]

We typically review the grant or denial of a motion for a new trial under the abuse of discretion or other error of law standard. See Commonwealth v. Lykus, 451 Mass. 310, 325-326 (2008). However, where the motion judge is not the trial judge,

---

[13] The trial judge had retired.

[14] In his affidavit, the defendant's trial counsel represented, inter alia, that the defendant had been deemed competent by a doctor before trial, and that counsel had agreed with that evaluation at the time; that the defendant did not appear to have difficulty understanding the trial proceedings; and that counsel was "very sensitive" to the defendant's struggles with mental illness and asked the defendant "several times every day during the trial whether he was okay and whether he understood what was going on," and the defendant always replied in the affirmative.

and no evidence is taken, we are able to assess the trial record and conduct a de novo review.  See Commonwealth v. Grace, 397 Mass. 303, 307 (1986).

"A judge is required to conduct an evidentiary hearing on a motion for a new trial only if a substantial issue is raised by the motion or affidavits."  Commonwealth v. Torres, 469 Mass. 398, 402 (2014).  See Commonwealth v. Wallis, 440 Mass. 589, 596 (2003); Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001).  In deciding whether to hold an evidentiary hearing, "a judge considers the seriousness of the issues raised and the adequacy of the defendant's showing on those issues."  Torres, supra at 402-403.  During this inquiry, a judge may consider the affiant's self-interest or bias. See Commonwealth v. Leng, 463 Mass. 779, 787 (2012) (motion judge did not abuse her discretion when she refused to credit defendant's uncontroverted affidavit).

In his written decision, the motion judge weighed the competing affidavits and found, "Because I credit trial counsel's affidavit [that he monitored the defendant's mental state in light of the defendant's potential incompetence], I do not credit the countervailing representations set forth in the other affidavits."  The motion judge denied the motion for new trial without a hearing.

Based on the defendant's failure to raise a substantial

issue by affidavit, we conclude that the motion judge's denial of the defendant's motion for postconviction relief without a hearing did not constitute an abuse of discretion. See Commonwealth v. Tucceri, 412 Mass. 401, 409, 414 (1992).

f.  Review under G. L. c. 278, § 33E.  The defendant argues also that there were mitigating facts in this case that warrant exercise of our authority under G. L. c. 278, § 33E, to reduce the degree of guilt to manslaughter or, in the alternative, murder in the second degree.  We have carefully reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, and discern no reason to order a new trial or to reduce the conviction to a lesser degree of guilt.  See Lao, 443 Mass. at 781.

Judgments affirmed.

Order denying motion for a
 new trial affirmed.