NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13078

COMMONWEALTH  vs.  MARK O'BRIEN.


Plymouth.     March 8, 2024. - July 3, 2024.

Present:  Budd, C.J., Gaziano, Wendlandt, & Georges, JJ.


Homicide.  Firearms.  Burglary.  Robbery.  Larceny.  Evidence,
    Joint venturer, Expert opinion, Argument by prosecutor,
    Inference, Informer.  Practice, Criminal, Argument by
    prosecutor, Capital case.  Witness, Expert, Police
    informer.  License.


Indictments found and returned in the Superior Court
Department on November 24, 2015.

The cases were tried before Jeffrey A. Locke, J.; and a
motion for a new trial, filed on August 27, 2021, was heard by
Mark A. Hallal, J.


Katherine C. Essington for the defendant.
Christine M. Kiggen, Assistant District Attorney, for the
Commonwealth.


WENDLANDT, J.  The defendant, Mark O'Brien, was convicted

of murder in the first degree for the killing of the victim,

Robert McKenna, in connection with a scheme during which the

defendant and his two coventurers entered the victim's home to

steal marijuana, a firearm collection, and other valuables.[1] The robbery devolved into a bloody melee when the three perpetrators found the victim, apparently to their surprise, to be awake; in the ensuing struggle, they struck the victim repeatedly in the head with a metal frying pan with sufficient ferocity to deform the pan. This blunt force trauma to the head, together with an arterial injury that the victim suffered when he crashed through a large picture window, caused the victim to die of exsanguination. In contrast to his coventurers, no deoxyribonucleic acid (DNA) or other forensic evidence placed the defendant at the scene. Thus, at trial, the defendant's principal defense was that he was not the third coventurer.

In this consolidated appeal, the defendant claims that the motion judge abused his discretion in denying his motion for a new trial because he received ineffective assistance of counsel; he asserts that trial counsel's decision to withdraw a request for an involuntary manslaughter jury instruction was manifestly unreasonable. He also contends that the trial judge improperly admitted shoe print expert testimony and that the prosecutor committed reversible misconduct by failing to correct a cooperating witness's incomplete testimony regarding the financial benefits provided to the witness in exchange for the

---

[1] The defendant was also convicted of twelve other charges. See part 2, infra.

witness's testimony. The defendant further challenges the prosecutor's closing argument; he asserts the prosecutor asked the jury to make unsupported inferences regarding the sequence of the victim's injuries. Finally, the defendant asks that we exercise our extraordinary authority under G. L. c. 278, § 33E, to reduce his conviction to murder in the second degree or manslaughter.

After carefully reviewing the defendant's claims on appeal and having conducted an independent review of the entire record, we discern no error and no reason to exercise our extraordinary authority under G. L. c. 278, § 33E, to order a new trial or to reduce the verdict of murder in the first degree to a lesser degree of guilt. Accordingly, we affirm the defendant's convictions of murder in the first degree, aggravated burglary, unarmed robbery, and larceny of a firearm, and the order denying his motion for a new trial.[2]

1. Background. a. Commonwealth's case. The following facts are supported by the evidence presented at trial.

The forty-five year old victim was a retired stockbroker. He lived alone with his two dogs in a spacious, ranch-style home in Marshfield, where he frequently hosted friends, neighbors,

---

[2] However, as discussed infra, we vacate the defendant's convictions of unlawful possession of a firearm and remand those charges for a new trial.

and acquaintances.  In his retirement, he had accumulated a large collection of African antiques, taxidermies, firearms, and other valuables.  He also maintained a substantial marijuana "grow" operation in his basement, consisting of thirty to fifty plants.  In addition to smoking cannabis oil, the victim also took apparently unprescribed pain and stimulant medications.

Among the many people the victim hosted at his home was Thomas Gunning, who was introduced to the victim in the summer of 2014.  From then until May 2015, Gunning visited the victim approximately a dozen times.  Impressed by the victim's collection of marijuana plants and firearms, which included an AK-47 rifle, among other semiautomatic rifles, Gunning sent photographs of the marijuana plants and firearms to various friends.

At the time, Gunning suffered from a substance use disorder.  He purchased drugs from one of the defendant's coventurers, Michael Moscaritolo, to whom Gunning sent photographs of the victim's marijuana plants.  Moscaritolo, who was a lawyer, expressed a keen interest in the victim's marijuana production, home, and habits, often peppering Gunning with questions about the victim.  In particular, Moscaritolo sought, and Gunning supplied, a diagram of the floor plan of the victim's home.  Moscaritolo also wanted to know whether the victim ever left the home, when the marijuana would be

harvested, and whether the victim owned weapons. "[I]n case I go in there and get the pot, I want to know if I'm going to get shot," Moscaritolo explained to Gunning.[3]

Based on the information he received, Moscaritolo devised a scheme to rob the victim. He enlisted the help of his friend and the second of the defendant's coventurers, James Ferguson. On a telephone call on September 12, 2015, four days before the victim's killing, Ferguson and Moscaritolo discussed a plan to rob a "heroin addict . . . [who] had a lot of money." Ferguson told his girlfriend, who had overheard the conversation between Ferguson and Moscaritolo, that they needed a driver to assist with the plan.

Three days later, at approximately 2:30 P.M. on the afternoon of September 15, 2015, the defendant drove Ferguson to a home improvement store and an electronics store in the defendant's gray Isuzu Rodeo sport utility vehicle (SUV).[4] Later that day, at around 8 or 9 P.M., Ferguson's roommate observed the defendant arrive in his car at Ferguson's home with another person in the vehicle. At around 9 P.M., as the roommate left

---

[3] At trial, defense counsel argued that Gunning, and not the defendant, was the third coventurer along with Moscaritolo and James Ferguson, who is discussed infra.

[4] Officers recovered receipts from these stores in Ferguson's home, and surveillance video footage shows Ferguson and the defendant entering the stores.

the house, the roommate observed that the defendant was still outside.

The victim was killed in the early morning hours of September 16, 2015. At 1 A.M. that morning, one of the victim's neighbors was awoken by his dog; and between 3 and 3:30 A.M. he was again awoken, this time by the sounds of dogs barking from inside the victim's home. The neighbor heard a male voice, and as he looked out the window toward the victim's home, he saw a man leaving the victim's driveway. The man was holding a flashlight and what appeared to be a rolled-up bag. The man entered a black or dark-colored car.

Another of the victim's neighbors, whose bedroom was twenty to thirty feet from the victim's garage, also was awoken at 1 A.M. She heard the sound of glass breaking. She fell back asleep. At 3 A.M., she again was roused, this time by the sound of a loud crash, followed by approximately five loud banging sounds. She heard the voices of three or four men arguing and dogs barking, and then saw a black or dark-colored car leaving the victim's driveway. The neighbor and her roommate went over to the victim's house to investigate but found nothing amiss from the outside.

On the afternoon of September 16, at around 3:30 or 4 P.M., a close friend of the victim arrived at the victim's home. Using a spare key to enter, he found the victim's two dogs in

the garage with blood on them.  Entering the main portion of the house, he discovered the victim's body lying on the kitchen floor.  He called 911, and police and paramedics arrived shortly thereafter.

The victim's body lay face up in a pool of blood, dressed only in underwear.  A cellular telephone was found under the victim's bare foot.  The victim had multiple lacerations caused by blunt force trauma to the back of his head, as well as lacerations, bruising, and blunt force injuries to the front of his head and his torso and upper and lower extremities.  The victim also had a deep laceration under his arm.  The medical examiner determined that the cause of death was blood loss caused by a combination of the laceration under his arm and the head injuries.  He opined that the arm laceration alone would have proven fatal within several minutes; the head lacerations potentially could have caused fatal blood loss if the bleeding was not stopped promptly.  A faint partial shoe print was found on the victim's chest.

Blood was found throughout the house, covering walls, floors, and furniture in the kitchen, hallway, master bedroom, and spare bedroom.  The house showed other signs of struggle. In the kitchen, pans were knocked over; in the master bedroom, dresser drawers were on the floor and a stool was knocked over. Two loaded revolvers were found, along with shotgun shells, and

two "long guns" on the floor of the master bedroom.  Three sets of shoe prints and one set of bare footprints were found in blood throughout the house.  On the dining room floor, officers found a purple latex glove turned inside out.

In the spare bedroom, police found a shattered picture window and copious amounts of blood.  In the master bedroom, which was also covered in blood, officers recovered a metal frying pan splattered with blood.  One edge of the pan was caved in.  Investigators determined that the lacerations to the victim's head likely were caused by being struck with the frying pan.  The deep laceration under the victim's arm likely was sustained from broken glass shards from crashing through the large picture window.[5]

Police recovered several items of clothing scattered alongside roads within several miles of the house, including a black and gold work glove, a pair of Nike Air Max sneakers, one of which was bloodstained, a pair of camouflage shorts, a camouflage jacket, and a bloodstained blue shirt labeled with the name of a charity golf event that Moscaritolo had attended.

Moscaritolo's DNA was recovered from the purple latex glove found inside the house.  DNA analysis showed that Moscaritolo

---

[5] Glass shards were found outside the glass window, indicating the window had broken from the inside of the house, and the broken glass was stained with blood.

and the victim were potential contributors to DNA recovered from a flashlight found outside the victim's home.  Moscaritolo's, Ferguson's, and the victim's DNA were also obtained from the discarded black and gold work glove found on the ground several houses away from the victim's home.  The victim's DNA was recovered from blood on the left Nike Air Max sneaker, and "wearer" DNA found on the inside of the right sneaker matched Moscaritolo.  DNA recovered from the golf tournament shirt matched Ferguson's DNA profile.  The defendant's DNA profile was not matched to any of the recovered DNA samples.

Ten days after the killing, on September 26, investigators arrested Ferguson.  Upon searching Ferguson's cellular telephone, they identified the defendant's contact information and incoming and outgoing calls with the defendant between 9:12 and 9:15 P.M. on the night preceding the killing.  Cellular telephone records showed that Moscaritolo's, Ferguson's, and the defendant's cellular telephones were all off between 12:47 A.M. and 4:13 A.M. on the morning of the killing.

On October 1, officers interviewed the defendant at his home.  They searched his vehicle and observed that it was extremely clean.  From the vehicle, officers recovered cleaning supplies and a pair of black and gold work gloves of the same brand discovered near the victim's home.  They also found signs

of occult blood in several locations in the passenger compartment of the vehicle.

From Moscaritolo's home, police officers recovered a pair of Nike Air Max sneakers, purple latex gloves, and marijuana. Moscaritolo's girlfriend, who was charged as an accessory after the fact and testified pursuant to a cooperation agreement, recounted that she had repeatedly called Moscaritolo over the night of September 15 into the morning of September 16, but had been unable to reach him; she did not speak with him until 6 A.M. on the morning of the killing. She also testified that in the afternoon following the killing, Ferguson and the defendant arrived at her home in a silver SUV; a large bag was in the vehicle. She observed that the defendant wore a hat and had a "red . . . cut underneath his eye [that] was like a rug burn."

On September 28, two associates of Moscaritolo's girlfriend retrieved a large bag from her and brought it to the home of one of the associates. The bag contained a number of rifles and shotguns. Police officers later recovered the weapons from that associate's mother's home and identified the recovered weapons as the firearms missing from the victim's home.

In early October, the defendant moved into the apartment of a friend, Ronald King. King was a long-time informer for the Boston police department. Dating back to 2001, he had provided

as many as 400 tips to police officers in that department and had received approximately $30,000 in exchange.

Shortly after the defendant moved into the apartment, King asked about the killing; the defendant denied any involvement. Over time, however, the defendant slowly revealed to King that he had been involved in the robbery and killing. His admissions began with the revelation that he had picked up people, including Ferguson, from the victim's home on the night of the killing, and that Ferguson had thrown clothes out the window of his car. Later, when the defendant also became aware that King's friend had been talking about guns stolen from the victim's home, the defendant told King that the guns had come from the victim's home and urged King to tell the friend to stop talking about the guns. King asked the defendant if blood from the firearms could have gotten in his car; the defendant replied that that was not possible because the weapons had been in garbage bags in his car. The defendant insisted, in his discussions with King, that he had cleaned his car because his brother accidently had cut himself and had bled in it.

Later in the month, however, the defendant confessed to King that he had been the third person at the victim's home. He said that "the lawyer [Moscaritolo]" had "set it up." The plan was supposed to be a simple robbery, but "things got ugly," he

recounted to King. The defendant expressed concern that he might go to prison for the rest of his life.

Shortly after this last conversation, the defendant saw that King had received a subpoena. The defendant urged King not to reveal the defendant's confession; he arranged with King to exchange exculpating text messages stating that King did not think the defendant was involved.

King eventually agreed to provide testimony. In exchange, the Commonwealth provided King with travel expenses and twelve dollars to change his cellular telephone number.[6]

b. Defendant's case. The defendant did not testify or present witnesses. Instead, through cross-examination and argument, the defendant contended that he was not the third coventurer with Moscaritolo and Ferguson. In particular, the defense pointed to the lack of DNA, fingerprints, and other physical evidence linking the defendant to the crime scene. By contrast, ample physical evidence placed Moscaritolo and Ferguson at the victim's house and in the perpetrators' flight path away from the home. The defendant suggested other potential perpetrators, including Gunning, and the aforementioned associate of Moscaritolo's girlfriend, who had

---

[6] This is the extent of the benefits that King acknowledged in his testimony. As discussed in part 3.c, infra, the defendant argues that King's testimony on this point was incomplete.

been charged with being an accessory after the fact, among others.

2. Prior proceedings. In November 2015, a grand jury returned a fourteen-count indictment against the defendant, charging him with murder, G. L. c. 265, § 1; aggravated burglary (assault on an occupant), G. L. c. 266, § 14; unarmed robbery, G. L. c. 265, § 19 (b); five counts of larceny of a firearm, G. L. c. 266, § 30; five counts of unlawful possession of a firearm, G. L. c. 269, § 10 (a); and one count of intimidation of a witness, G. L. c. 268, § 13B.

Following a three-week jury trial in September 2019 in the Superior Court, the defendant was convicted of murder in the first degree under theories of felony-murder[7] and extreme atrocity or cruelty, as well as twelve of the remaining thirteen charges. The court entered a required finding of not guilty for the witness intimidation charge.

---

[7] In Commonwealth v. Brown, 477 Mass. 805, 807 (2017), cert. denied, 139 S. Ct. 54 (2018), we eliminated felony-murder as an independent theory of liability for trials commencing after the date of our decision. We "limited [felony-murder] to its statutory role under G. L. c. 265, § 1, as an aggravating element of murder, permitting a jury to find a defendant guilty of murder in the first degree where the murder was committed in the course of a felony punishable by life imprisonment even if it was not committed with deliberate premeditation or with extreme atrocity or cruelty." Id. at 808-807.

The defendant appealed timely.  He also filed a motion for a new trial, which we remitted to the Superior Court.  The defendant argued he received ineffective assistance of counsel because trial counsel withdrew his request for a jury instruction on involuntary manslaughter.  Following a nonevidentiary hearing, the motion judge, who was not the trial judge,[8] denied the defendant's motion.  The defendant timely appealed.

3.  Discussion.  The defendant contends that he received ineffective assistance of counsel because his trial attorney withdrew a request for an involuntary manslaughter instruction, that the trial judge erred in permitting the Commonwealth's shoe print expert to opine on the source of the shoe print on the victim's chest, that the prosecutor committed reversible misconduct by failing to correct a key witness's incomplete testimony regarding the financial benefits he received in exchange for his testimony, and that the prosecutor argued impermissible inferences regarding the sequence of the victim's injuries in her closing argument.  We address each contention in turn.

a.  Ineffective assistance of counsel.  The defendant first challenges the denial of his motion for a new trial, maintaining

---

[8] The trial judge recused himself.

that he received ineffective assistance of counsel because trial counsel withdrew his request for a jury instruction on involuntarily manslaughter.  Although trial counsel earlier had sought such an instruction, when asked by the trial judge prior to the charge conference whether the defendant desired an instruction on involuntary manslaughter, trial counsel conceded, "I don't know that the evidence necessarily supports even a request for an involuntary manslaughter [instruction]."[9]

In analyzing the denial of a motion for a new trial, we examine the judge's conclusions "to determine whether there has been a significant error of law or other abuse of discretion." Commonwealth v. Fernandes, 492 Mass. 469, 475 (2023), quoting Commonwealth v. Jackson, 468 Mass. 1009, 1010 (2014).  Where, as here, the motion judge did not preside at trial and did not conduct an evidentiary hearing, "we regard ourselves in as good a position as the motion judge to assess the trial record." Commonwealth v. Kirkland, 491 Mass. 339, 346 (2023), quoting Commonwealth v. Jacobs, 488 Mass. 597, 600 (2021).

---

[9] Trial counsel had earlier moved to dismiss the murder indictment on the ground that there was insufficient evidence of malice, had submitted a written request for an involuntary manslaughter instruction, had requested a voluntary manslaughter instruction, and had sought an "unlawful killing" instruction, requiring the Commonwealth to prove that the injury the victim sustained from crashing through the window was not the product of a mistake or accident.

We review claims of ineffective assistance of counsel raised in connection with a direct appeal of a conviction of murder in the first degree for a substantial likelihood of a miscarriage of justice, considering "whether there was error and, if so, whether the error was likely to have influenced the jury's conclusion." Kirkland, 491 Mass. at 346, quoting Commonwealth v. Don, 483 Mass. 697, 704 (2019). See Commonwealth v. Mercado, 452 Mass. 662, 666 (2008) (statutory standard under G. L. c. 278, § 33E, "is more favorable to a defendant than the constitutional standard for determining the ineffectiveness of counsel"). "In conducting this review, we 'accord tactical decisions of trial counsel due deference,'" and conclude that trial counsel provided ineffective assistance only if trial counsel's decision was "manifestly unreasonable." Kirkland, supra, quoting Don, supra at 704-705. "'[O]nly strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent' rise to the level of manifestly unreasonable." Kirkland, supra, quoting Commonwealth v. Kolenovic, 471 Mass. 664, 674 (2015), S.C., 478 Mass. 189 (2017).

If the evidence does not support an involuntary manslaughter instruction, trial counsel's decision not to seek one is reasonable. See Commonwealth v. Tyler, 493 Mass. 752, 762 (2024); Commonwealth v. Acevedo, 446 Mass. 435, 442 (2006).

An involuntary manslaughter instruction is warranted if "any view of the evidence will permit a finding of [involuntary] manslaughter and not murder." Commonwealth v. Jessup, 471 Mass. 121, 135 (2015), quoting Commonwealth v. Sires, 413 Mass. 292, 301 (1992).[10]

Involuntary manslaughter arises "where wanton [or] reckless conduct causes death." Commonwealth v. Simpson, 434 Mass. 570, 590 (2001), citing Commonwealth v. Fryar, 425 Mass. 237, 248, cert. denied, 522 U.S. 1033 (1997). Such wanton or reckless conduct is "intentional conduct that create[s] a high degree of likelihood that substantial harm will result to another person." Commonwealth v. Pagan, 471 Mass. 537, 547, cert. denied, 577

---

[10] Prior to our decision in Brown, in which we abrogated the felony-murder rule as an independent theory of liability for murder in the first degree, we maintained that "[w]here the felony-murder rule applies, generally the defendant is not entitled to an instruction on manslaughter." Commonwealth v. Evans, 390 Mass. 144, 151 (1983). That was because, under the felony-murder rule, the intent to commit the underlying felony sufficed to show constructively the malice necessary for murder, and manslaughter mitigates malice, not constructive malice. See Brown, 477 Mass. at 825-826 (Gants, C.J., concurring). See also Tyler, 493 Mass. at 760 n.6.

For trials commencing after our decision in Brown, including the defendant's, the Commonwealth must prove malice to obtain a murder conviction. See Brown, 477 Mass. at 807. Thus, involuntary manslaughter is a viable charge against a defendant who, in the course of committing a felony, wantonly or recklessly or as the result of a nonfelony battery, caused the death of an individual but acted without malice. See Tyler, 493 Mass. at 760 n.6. See also Commonwealth v. Simpson, 434 Mass. 570, 590 (2001) (defining involuntary manslaughter).

U.S. 1013 (2015), quoting Commonwealth v. Chambers, 465 Mass. 520, 536 n.15, (2013).  See, e.g., Commonwealth v. Welansky, 316 Mass. 383, 397 (1944) (owner of nightclub guilty of manslaughter in deadly fire resulting from wanton and reckless management of club, despite being absent at time of fire).  Alternatively, involuntary manslaughter is an unintentional killing resulting "from a battery not amounting to a felony [but] which the defendant knew or should have known endangered human life."[11] Simpson, supra, quoting Fryar, supra.  See, e.g., Commonwealth v. Catalina, 407 Mass. 779, 784 n.6 (1990) (nonfelony battery type involuntary manslaughter shown where defendant, who was substantially larger than victim, punched victim in face with sufficient force to cause victim to fall backward and strike head on sidewalk, resulting in victim's death).

Murder, by contrast, requires a showing of malice.  Pagan, 471 Mass. at 546.  Malice entails "(1) an intent to kill the victim; (2) an intent to cause grievous bodily harm to the

---

[11] A distinguishing feature between the two forms of involuntary manslaughter is that in the first, the wanton or reckless conduct need not constitute battery.  See Commonwealth v. Catalina, 407 Mass. 779, 789 (1990).  In the second, the battery need not have amounted to wanton or reckless conduct for it to serve as the basis of an involuntary manslaughter conviction.  See id. at 784 n.5 (noting that previously, "we rejected [a] defendant's argument 'that a "battery" to be the basis of a conviction of involuntary manslaughter, must first be found to have amounted to 'wanton or reckless conduct'").

victim; or (3) commission of an act that, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood of death." Id. at 546-547, quoting Commonwealth v. Riley, 467 Mass. 799, 821–822 (2014). "The difference between the elements of the third prong of malice and . . . involuntary manslaughter lies in the degree of risk of physical harm that a reasonable person would recognize was created by particular conduct, based on what the defendant knew." Sires, 413 Mass. at 303 n.14.

Where, as here, the severity of a beating is such that "it is obvious that the risk of physical harm to the victim creates a plain and strong likelihood that death would follow . . . an instruction on involuntary manslaughter [is] not warranted" (quotation omitted). Commonwealth v. Burnham, 451 Mass. 517, 527 (2008), quoting Commonwealth v. Fitzmeyer, 414 Mass. 540, 547 (1993). See, e.g., Commonwealth v. Moseley, 483 Mass. 295, 303-304 (2019) ("obvious risk of physical harm associated with" strangling victim rendered involuntary manslaughter unavailable). In other words, the "circumstances of the killing and injuries sustained by the victim" may be "[in]consistent with anything other than [a finding of] malice." Commonwealth v. Silva, 471 Mass. 610, 621-622 (2015) (involuntary manslaughter instruction not warranted where defendant and coventurer severely beat victim, knocking him down, kicking him,

and then stomping on his chest causing victim's eyes to "bug out").

Here, the victim suffered multiple blows to the front of his head, his torso, and his extremities. The beating also included repeated strikes to the back of his head with a frying pan with such ferocity that the pan deformed, and the chaotic carnage of the blood-drenched crime scene indicated a prolonged and violent struggle. These circumstances of the victim's death, and the injuries he sustained, are inconsistent with a finding of either nonfelony battery or mere wanton or reckless conduct likely to cause substantial harm short of death. See Moseley, 483 Mass. at 303-304; Silva, 471 Mass. at 622; Commonwealth v. Donovan, 422 Mass. 349, 353 (1996) (no rational basis for finding nonfelonious battery for stab wound to heart).

Arguably, when viewed in the light most favorable to the defendant, the jury could infer that the defendant, although the third coventurer,[12] did not himself strike a felonious blow as it was unclear how many of the coventurers assaulted the victim. Nonetheless, an involuntary manslaughter instruction is unsupported in view of the evidence showing his participation in

_____

[12] Unlike the defense that trial counsel pursued at trial -- namely, that the defendant was not the third coventurer with Moscaritolo and Ferguson -- an involuntary manslaughter defense would require the jury to conclude that the defendant was the third coventurer.

the murder as a joint venturer.[13]  The evidence, which included

three sets of coventurers' shoe prints alongside the impressions

of the victim's bare feet throughout the victim's home, fails to

support a theory that, if the defendant was the third

coventurer, he merely was present inside the victim's home but

was unaware of, and not complicit with, the repeated and brutal

assaults on the victim as he moved from room to room around the

house, spurting blood from his extensive wounds.[14]  See, e.g.,

Commonwealth v. Semedo, 422 Mass. 716, 719 (1996) (defendant

guilty of murder in first degree where he participated in fatal

group attack on victim in which defendant held, kicked, and

punched victim while another stabbed him).

In view of the evidence, trial counsel's decision to forgo

an involuntary manslaughter instruction in favor of the defense

that was pursued -- that the defendant was not at the victim's

---

[13] Murder in the first degree by joint venture requires proof that "the defendant was present at the scene of the crime, with knowledge that another intended to commit a crime, and by agreement was willing and available to help the other if necessary . . . [and] that the defendant shared with the principal the mental state required for the crime of murder." Commonwealth v. Semedo, 422 Mass. 716, 719 (1996).

[14] The defendant speculates that, after the severe beating inflicted on the victim, the victim fell through the window. This scenario, posited for the first time on appeal, does not warrant an involuntary manslaughter instruction.  Cf. Commonwealth v. Garcia, 470 Mass. 24, 32-33 (2014) (defendants acted with malice by locking victim in room to bleed out after beating and shooting him).

home and was not the third coventurer -- was not manifestly unreasonable.  Unlike the other two perpetrators, no DNA, forensic, or other physical evidence directly linked the defendant to the scene.  The defense plausibly pointed to other potential perpetrators, namely Gunning, who was Moscaritolo's source of information regarding the victim and who drove a black car similar to the one neighbors described seeing at the victim's home.  Trial counsel also suggested that one of Ferguson's girlfriend's associates, who was charged as an accessory after the fact and who also drove large dark-colored vehicles, was the third culprit.  Trial counsel's decision to pursue a strategy that had a greater chance of success was not manifestly unreasonable.[15]

b.  Shoe print expert.  The defendant next maintains that the trial judge abused his discretion in permitting expert testimony regarding the shoe print on the victim's bare chest.  Specifically, he claims the testimony was too speculative and inconclusive.  The expert witness, a State police trooper,

---

[15] The defendant incorrectly asserts that trial counsel was not pursuing an all-or-nothing strategy because he earlier had requested instructions on voluntary manslaughter.  After the trial judge rejected his bid for a sudden combat voluntary manslaughter instruction, however, trial counsel pivoted to an all-or-nothing defense -- a strategic decision that, as discussed supra, was not manifestly unreasonable.  See, e.g., Commonwealth v. Waller, 486 Mass. 72, 76 (2020) (pursuit of all-or-nothing defense strategy not manifestly unreasonable).

testified that he could not conclusively establish the type of shoe that created the partial print found on the victim's chest because the print "lack[ed] a perimeter and definition," but that certain "features were similar to portions of [a] Nike Air Max [shoe]."

Trial judges "have broad discretion in deciding whether to admit expert testimony." Commonwealth v. Torres, 469 Mass. 398, 406 (2014). A qualified expert witness may testify to subjects that "will help the trier of fact to understand the evidence or to determine a fact in issue." Mass. G. Evid. § 702(a) (2024). "The role of expert testimony is to assist jurors in interpreting evidence that lies outside their common experience." Commonwealth v. Hinds, 487 Mass. 212, 217 (2021), quoting Commonwealth v. Shanley, 455 Mass. 752, 761 (2010).

Expert testimony that is mere conjecture, however, is inadmissible. See LightLab Imaging, Inc. v. Axsun Techs., Inc., 469 Mass. 181, 191 (2014), quoting Sevigny's Case, 337 Mass. 747, 751 (1958) ("an opinion given by an expert will be disregarded where it amounts to no more than mere speculation or a guess from subordinate facts that do not give adequate support to the conclusion reached"). Yet, expert testimony need not be conclusive to be admissible. Commonwealth v. Ronchi, 491 Mass. 284, 302 (2023).

Our decision in Torres, 469 Mass. at 407, is instructive. There, we considered the testimony of a shoe print expert, who explained the method he used to determine a match and opined that the shoe print "could have" been made by the pertinent footwear but that the impression "was not detailed enough for a more definitive conclusion." Id. at 406-407. The jury were provided with the images that the expert analyzed, and "[i]t was made clear to the jury that this was a matter they could weigh for themselves."[16] Id. at 407-408. We determined that allowing the testimony was not an abuse of discretion. Id.

Here, as in Torres, the expert explained how he assessed the shoe print found on the victim's chest; copies of the images he analyzed were made available to the jury. The expert noted the limitations of the sample, opined that certain of the shoe print's "features were similar to portions of [the] Nike Air Max," and explained the limitations of his opinion "due to the limited detail" of the impression from the victim's chest. Although inconclusive, the opinion did not amount to groundless speculation. Rather, it gave the jury the information they

_____

[16] The defendant relies on our jurisprudence cautioning against too liberally admitting inconclusive DNA evidence. See Commonwealth v. Nesbitt, 452 Mass. 236, 253-254 (2008). However, shoe print analysis, which is relatively accessible to the understanding of a lay person, does not bear the same risks of undue prejudice as DNA evidence, which we have warned is susceptible to being overly persuasive. See Commonwealth v. Mattei, 455 Mass. 840, 852 (2010).

needed to "weigh [the matter] for themselves." Torres, 469 Mass. at 408.

c. Informant testimony. The defendant claims that the prosecutor elicited and failed to correct false testimony from King regarding the financial benefits he received in exchange for his testimony. Prior to trial, the prosecution disclosed to the defendant that for agreeing to testify against the defendant, King received $932.49 from the Commonwealth, including relocation expenses, twelve dollars to change his cellular telephone number, and a three-month supply of medication. During King's direct examination, the prosecutor asked him if he received any benefit beyond travel expenses in exchange for his testimony; King responded that he received twelve dollars to change his cellular telephone number. He did not mention the medications or any relocation expenses, only disclosing some travel expenses to attend the trial.

A prosecutor "may not present testimony at trial 'which [she] knows or should know is false.'" Commonwealth v. Ware, 482 Mass. 717, 721 (2019), quoting Commonwealth v. Forte, 469 Mass. 469, 490 (2014). Similarly, even if "not soliciting false evidence," a prosecutor may not allow the falsity "to go uncorrected when it appears." Ware, supra, quoting Commonwealth v. Hurst, 364 Mass. 604, 608 (1974). But "[m]inor inconsistencies do not [necessarily] constitute falsities."

Forte, supra at 491 ("Such inconsistencies may be due to any number of factors, including confusion, the passage of time, or poor perception, and they may be highlighted through cross-examination or rebuttal evidence" [citation omitted]).  Indeed, unless the "testimony is blatantly false and pertains to an issue central to the Commonwealth's case," a prosecutor's failure to correct the testimony will not amount to misconduct where the defendant has access at trial to materials showing the testimony's falsity and thus is able to "discern the statement's falsity."  Ware, supra at 725.

Here, King's testimony was not blatantly false; it was incomplete insofar as King did not mention the medications he had received, and he did not disclose relocation expenses. While the prosecutor did not prod King regarding other compensation he had received, trial counsel had the information regarding the full extent of King's compensation.  Tellingly, trial counsel did not object to King's incomplete answer or focus his cross-examination on it.  Instead, on cross-examination, trial counsel extensively questioned King on his years-long activities as an informant for the Boston police department during which time he had received over $30,000 -- compensation that dwarfed the value of the medication and relocation expenses he received in exchange for his testimony

against the defendant.  In these circumstances, the prosecutor did not commit misconduct.

d.  _Closing argument_.  The defendant also asserts that the prosecutor committed misconduct by drawing an unsupported inference in her closing argument.  In her closing argument, the prosecutor stated that the perpetrators beat the victim with the frying pan after he had already crashed into the picture window.  The defendant contends that the blood patterns and the testimony of the victim's neighbors suggest that the defendant in fact was beaten with the frying pan before the victim went through the window.  The Commonwealth in turn points to the bloody footprints on the floor to indicate that the victim had continued to struggle and suffer attacks after he had received the arterial laceration from the window.  Neither version of events is certain; each is a fair inference the jury could draw from the evidence.  As such, the prosecutor was entitled to invite the jury to draw the inference more favorable to the Commonwealth's position.  See _Commonwealth_ v. _Parker_, 481 Mass. 69, 74 (2018).

e.  _Firearm possession charges_.  The defendant additionally requests that we reverse his five convictions of unlawful possession of a firearm and enter judgments of not guilty.  When the defendant was convicted, licensure was an affirmative defense to a charge of unlawful possession of a firearm.  See

Commonwealth v. Guardado, 491 Mass. 666, 689 (2023) (Guardado I), S.C., 493 Mass. 1 (2023) (Guardado II).  However, after the United States Supreme Court's decision in New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022) (Bruen), we concluded that the Commonwealth must prove absence of licensure.  Guardado I, supra at 690.  "Because Bruen was decided after the defendant's trial but while the case was pending on appeal, he is entitled to the benefit of the new rule; that is, the right to have the Commonwealth prove that he lacked a license."  Guardado II, supra at 12.  The proper remedy is remand for a new trial on the firearm possession charges.  Id.  See Commonwealth v. Robinson, 493 Mass. 775, 796 (2024) (vacating unlawful possession charge for new trial).

f.  General Laws, c. 278, § 33E, review.  Having reviewed the entire record, we discern no other error warranting relief under G. L. c. 278, § 33E.

4.  Conclusion.  For the reasons discussed, the defendant's convictions of unlawful possession of a firearm are vacated and remanded for a new trial, and the defendant's other convictions are affirmed.  The order denying the defendant's motion for a new trial is also affirmed.

So ordered.